Good morning, Your Honors. Good afternoon, Your Honors. Stephen Feldman, CJA Counsel from San Diego, appearing on behalf of Xu Zhengli. May it please the Court. The District Court erred in denying funding for an eyewitness identification expert to consult with me, to assist me in adequately cross-examining the witnesses that I knew the government was going to bring against Xu Zhengli. I think it's common knowledge that it's circuit law that the Court has a duty to provide essential services for the defense. Those services embrace pretrial consultation, and a test is whether or not a reasonable attorney would have hired such an expert for a retained client. I do retain business. It's not a part of the record. I know when it's appropriate to hire expert witnesses, be they eyewitness in federal court or not. The Court should ordinarily, according to the circuit, rely upon the judgment of the trial counsel in determining whether or not it's appropriate to appoint an eyewitness or any expert. We interviewed him for abuse of discussion, yes? I believe so. And why isn't this well within the discussion of the District Court? Because I asked for consultation. I think this is a question of first impression in the circuit. I was seeking consultation, Judge. If you look to my declaration, which is the seminal declaration of the case, I submitted a declaration which specifically articulated the purposes of my request to consult with an eyewitness identification expert. I set forth specific and precise reasons why I believed the expert was appropriate. I incorporated within the declaration the material witness's testimony of deposition, so the expert, Dr. Shomer, who I know is not in sanction by the Court, but nevertheless, to provide to him the actual facts upon which he could base an opinion, because I've seen case law which talks about generalities as opposed to specifics. And had I had the opportunity to consult with Dr. Shomer, I would have had the ability to potentially present evidence that would have been specific to the facts and circumstances of the case. Mr. Lee was prejudiced. There's no question he was prejudiced. He was prejudiced by the false aura of veracity that each of the material witnesses presented. He was prejudiced by the fact that right before the witnesses testified, they were shown single photographs of Zhu Zhengli by the agent and the prosecution attorneys right before they were about to testify and make an identification in the courtroom. That process was not followed prior to the depositions. I look back through my notes. Only one of the witnesses, possibly two, were shown at deposition prior to identifying Mr. Lee, his single photograph. That kind of a show-up is outrageously suggestive, and I had no way to present evidence of that fact absent the eyewitness expert. The Court, in denying my application, cited to Lamb & Sand, which I know is the law of the circuit regarding eyewitness ID. But Lamb & Sand is consequentially different from this case, because in Lamb & Sand, there was a bank surveillance photograph taken. There was overwhelming evidence of guilt. Several of the witnesses had identified the defendant in a photo spread. And in our case, absolutely none of the witnesses were shown a photo spread, because in the words of the government lawyer, when we were raising this issue at Reporters Transcript 1760, quote, if we had any questions as to who was involved in the offense, we would have shown them a six-pack. The fact of the matter is they were arrested there at the scene, so here's what it is. So it is what it is. The Court. Okay. The Court's going to continue to rule as I previously did. So there's a problem in that the Court at that moment turned to the prosecution to seek input on whether or not it would have been appropriate when I renewed my motion for an eyewitness expert, although at that time I concede I said eyewitness expert to testify. Nevertheless, my earlier seminal declaration made explicitly clear that I wanted consultation. And when you think about it, it doesn't seem inappropriate to provide defense attorneys essential tools of the defense in an eyewitness identification case where the primary evidence against the defendant are the eyewitness cases, to provide a consultant whether or not the consultant ultimately testifies is a question of admissibility to be determined at a hearing in limine, but I wasn't even seeking that in the first instance. I was seeking the opportunity to consult with an expert to assist me in cross-examining the witnesses. I didn't understand that. I didn't hear you. How the consultant would have helped you. So here's the answer. The issue really bloomed, ripened during the direct examination of Agent Vega. There was the sidebar where I renewed my request, and then I called Agent Vega because I had to present evidence of single show-up photographs. And Vega then testified to the facts and circumstances of what it was they had done. And he testified, I've been trained, I went to the academy, and at the academy there was a man in a uniform. And the man in the uniform seemed to know what he was doing. Well, in point of fact and in point of truth, there's a substantial body of scientific evidence regarding eyewitness identification. Whether or not it's admissible or not, I don't believe is the issue before the court today. I think the issue before the court today is whether it was appropriate. I don't think you understood my question. I'm sorry. What identification are you talking about? How would this have helped you in the context of the trial? It would have allowed. What was the proof? What were the witnesses? What was the identification? Specifically, with regard to Ming Zhu, she was the female material witness. She testified that she did everything she could to put the circumstances out of her mind as best she could. And I can't remember whether it's 28 or 42 days' lapse between the time she was arrested and the time she first started to think about the events. Raman says it's common knowledge that memory fades with time. But it's quite obviously not the case that it's common knowledge. Because how was I going to explain to a jury how absurd it was that this particular witness suddenly after 42 days had a recollection after she was shown a photograph? And what effect does certainty of the witness have on, or any of the witnesses, have on the accuracy of their identification testimony? I was not allowed to present that at all. There was no way to argue. I suppose I could argue it, but without any basis whatsoever, that a witness's certainty has any bearing on the accuracy and the reliability of their identification. The four other witnesses sat together in the same custodial circumstance every single day for virtually the entire period of pretrial incarceration. This case lasted better than a year. They discussed the case amongst themselves, although I believe they denied it in trial, which is patently absurd. And they shaded their testimony as they learned information. And we know that because one of the material witnesses testified with regard to a flag out of the blue, that he thought the flag was the Mexican flag. And there's no evidence whatsoever that the Mexican flag, no, he said it was a Japanese flag. I'm sorry. So the information that the eyewitness expert could have, the consultation that he could have provided, would have assisted me in better focusing my cross-examination on Agent Vega, would have allowed me to challenge his training with regard to the conclusions that he was rendering, would have allowed me to have better impeached the single photographic show-up, which may have caused the jury to relook at the accuracy of the identification testimony. And so certainly Mr. Lee was prejudiced by that denial. I hope I addressed the Court's question on that. I'm trying, Judge. May I please ask you to restate it? I understand. What does the identification role play in the trial? Why don't you tell me about the fact that there are two vehicles, right? Correct. Okay. And your client gets stopped. Correct. And then there was this truck up ahead. A vehicle, yes. And the truck is concealing the aliens, right? Yes, Your Honor. Okay. So there's no doubt that he's the guy that got stopped, right? There's no doubt he's the guy that got stopped. I agree. So why is there an identification problem with that? No, I haven't. He's the guy that got stopped. Correct. Okay. We also know that the other vehicle got stopped. There's no doubt about that. Agreed. And Wong is the guy driving that, right? Agreed. Okay. So tell me about this eye-witness identification. So now. What is it? So taking it from that point. Forgive me, I did not mean to interrupt, Your Honor. Taking it from that exact point. I didn't mean to interrupt anyway. Unintentional interruption? Respectfully. Talk to me about what difference any of this would make in the context of a trial. If there's no identification, then my theory was that Mr. Lee was along with his uncle helping him move. Now, what we learned in trial was that the agent had no idea that in the Chinese culture, when an individual refers to his old uncle, he's referring to a friend or an elderly person. But didn't they right then and there stop the second truck and open the box and there were the smuggled billions? No dispute. What? No dispute. I know. What I'm saying is, I mean, how really critical was the eyewitness testimony? They were stopped red-handed in tandem with illegal aliens in a box. Knowledge. The issue in the case was Mr. Lee's knowledge. He said it so much better than I did. Yeah, like what difference does it make? I mean, he's there on the highway riding in tandem with this other guy who's hiding aliens. What else do you need? You need to join in a conspiracy. You had to have knowledge of the purpose of the conspiracy. You had to have knowledge of what it was you were doing. You had to know that you were participating. And the defense in the case as to that issue was Zhu Zhengli did not have knowledge because Mr. Wong did not tell him, because he was working for another gentleman named Ali. So in response to the Court's question. And what jury will believe that one? I think you can never know what a jury is going to believe, Your Honor, based on all of our experience. You never can tell what a jury is going to believe. Yeah, but it's very hard to say that in those circumstances the district court is abusing its discretion by saying, no, you don't get an expert to try to knock down this thing. There's probably not very highly cooperative anyway. I would submit to Your Honors. You're going for the capillary. You're missing the jugular. Well, I'm not sure what you're considering to be the jugular. I think knowledge is. The jugular is they were driving on the highway together, and the one guy's got a box full of alien stuff in his car. That's the jugular. The capillary is, you know, oh, well, so many days later they discussed it in a little box, and they identified it. All that stuff is so picky, isn't it? I would submit that knowledge was the issue. Let's say they all said, all of them said, look, I don't know who that other guy was. It might have been this guy. It might not have been this guy. Let's say the government hadn't even put that evidence on. So what? Well, you know, we people convicted a lot less. Let's say these were drugs and not aliens. Drugs don't talk. Same issue. The defendant has to have knowledge that there are drugs in the vehicle. There's no showing. But very often this thing is proven by circumstantial evidence, the fact that one guy is smuggling, and they are doing things in tandem, and one guy says, oh, I know him. The other guy says, no, I have no idea who this guy is. Well, that alone, that right there tells you, you know, if they really were moving furniture, why would the guy who drove the truck say, well, I don't know him. Who is this? Who is this guy behind me? That's suspicious behavior right there. Why was he saying, yeah, he was helping me move my furniture? What's interesting about the Court's analogy is that we see acquittals in district court all the time in multiple defendant cases where one defendant claims to not have known, and it's a jury question. I think the Court is jumping to the conclusion and drawing the obvious inferences that you have to draw given the position of the court of appeal. But I think in the trial court it's much different, Your Honor. In the trial court, we don't know what the outcome is. We see the facts. We argue the facts as best we can. We articulate the facts and present our theories. In this case, I was denied an essential tool for the defense. That's a fact. I mean, let's say you deny a tool, which I'm not familiar with, but let's say you deny it and we knock out everything that those witnesses said. Yes, Your Honor. Then you have, driving the vehicle, you have a small amount of money that – I'm sorry. You have a $10,000 amount of money that was located, I think, in Zhu Zhengli's car, but for which there was a receipt from a bank withdrawal that was his own bank. You have the allegation from the government's pleadings that there was a huge amount – my word, I'm sorry – a large amount of Korean and Chinese currency, but in stipulation it was worth maybe $15 or $20. Ms. Febb would recall that probably better than I. And we had an explanation in trial when Zhu Zhengli testified that he cashed some money in, I can't recall where, China or Korea, which resulted in the breaking of the denominations. All of that is completely reasonable. And so what do we have? We have his presence with Wong. We have him driving in a vehicle with money. We have the cell phones. But if you look to the testimony of Agent Joe Wong – We have inconsistent accounts from the two of them as to what they were up to. One guy says, I was helping this other guy move. Another guy says, who's he? Exactly right. And the guy who said who's he was lying and he pled guilty and is now in prison. That's right. So I think I would prefer to reserve, if I may. If the Court has other questions, of course, I'd like to. But if I have any time left, I'd like to reserve. No, no, sir. Thank you. Okay, we'll give it to the Governor. Your time. Good afternoon. Sabrina Fab from the United States. I'll begin by noting what the Court has already alluded to, which is that all five of the issues raised by Mr. Feldman on behalf of his client are subject to the abusive discretion standard, and that given the overwhelming evidence that the government put on in almost four weeks of testimony, Mr. Lee cannot show that the District Court abused its discretion and he certainly cannot show prejudice because of this overwhelming evidence. But turning to the individual arguments raised by Mr. Feldman, the first is that he is a... Do you feel there's anything you need to report? It's not covered in your brief? I'd be happy to submit, Your Honor. Thank you. Here's your time, here's your minutes. We're adjourned. How are we going to handle the talking to the students? We'll come out after conference. After conference. We're adjourned. We'll be back to talk to the students after conference. All rise. This session stands adjourned. Congratulations.
judges: Kozinski, Reinhardt, Wardlaw